**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LATANYA ROGERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 C 5389** |
| **v.** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **LOUIS DEJOY, Postmaster General** | ) | |
| **of the United States Postal Service,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff LaTanya Rogers was terminated from her position as a United States Postal Service ("USPS") mail carrier in Wood Dale, Illinois, after a supervisor saw her driving with her door open on an industrial route. Plaintiff filed a *pro se* complaint alleging discrimination and retaliation by Defendant Louis DeJoy, United States Postmaster General,[1] based on her race, sex, and previous equal employment opportunity activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Plaintiff further alleges that Defendant failed to stop harassment and subjected her to a hostile work environment. Defendant now moves for summary judgment, arguing that Plaintiff has not presented evidence that she satisfied legitimate employment expectations or that any similarly situated employee was treated more favorably. For the reasons set forth below, Defendant's motion for summary judgment [32] is granted.

**BACKGROUND**

Plaintiff worked as a mail carrier for the Wood Dale post office for seventeen years. (Def.'s L.R. 56.1 Statement of Material Facts [34] (hereinafter "Def.'s SOF") ¶ 1.) Wood Dale is close to

---

[1] This case was originally styled as *Rogers v. Brennan*. Louis DeJoy has since replaced Megan Brennan as Postmaster General and is substituted as Defendant per FED. R. CIV. P. 25(d).

O'Hare Airport, and many of the mail routes in Wood Dale cover industrial areas rather than residential neighborhoods. (*Id*. ¶ 3.) At the time of Plaintiff's termination, she was assigned to a largely industrial route just west of the airport. (*Id*.) During a routine route inspection on August 22, 2016, Kusum Puri, Postmaster of the Wood Dale post office, saw Plaintiff driving through an industrial area with her postal vehicle door open. (*Id*. ¶ 13.) Puri was accompanied on the route inspection by Union Steward Stefania Alfano, but Alfano's testimony is not in the record. (*See* Rogers's Notice of Removal, Ex. 5 to Def.'s SOF [34-5] at 1; Pl.'s Mem. [37] at 2:13–17.) According to Puri, the distance between delivery points on Plaintiff's route was long enough that her door should have been closed for safety reasons. (*See* Rogers's Notice of Removal at 1.)

The parties dispute whether Plaintiff was wearing a seatbelt at the time of the inspection: Plaintiff claims that she was, while Defendant states that she was not.[2] (Def.'s SOF ¶¶ 13–14.) Plaintiff does not dispute that she drove through an industrial area with her door open. (*Id*. ¶ 15.) Instead, she argues that USPS had no policy prohibiting her from doing so, or that the policy was unclear. (*Id*. ¶ 14.) Defendant maintains that as a matter of official USPS policy, mail carriers must keep their doors closed at all times when driving through industrial areas. (*Id*. ¶ 28.) Plaintiff's supervisor, William Martin, delivered numerous safety talks in which he emphasized that postal vehicle doors must remain closed. (*Id*. ¶¶ 8–10.) For example, in March 2013, Martin delivered a safety talk prompted by the death of a mail carrier in Florida, who was driving with his door open and without a seatbelt when he was hit by another motorist; the carrier fell out of the open door and the vehicle rolled over him, causing his death. (*Id*. ¶ 8.) Attendance records show

---

[2]    In her brief in opposition to summary judgment, Plaintiff claims that Union President Mike Losurdo "didn't want [Alfano] named as a witness" at her pre-disciplinary hearing, even though "[s]he was a witness to everything that happened that day." (Pl.'s Mem. at 2:16–17; *see also* Rogers's Notice of Removal at 1 (stating that Rogers, President Losurdo, and William Martin—but not Alfano—were present at Rogers's pre-disciplinary interview).) Plaintiff seems to suggest that Alfano would have corroborated her account that she was wearing a seat belt. As explained below, however, whether Plaintiff was wearing a seat belt is not material for purposes of summary judgment.

that Rogers attended at least eight of these safety talks between August 2010 and July 2016. (*Id.* ¶ 9.) Plaintiff, for her part, recalls Martin saying that carriers could generally drive with their doors open, just not through intersections. (*Id.* ¶ 26.)

All mail carriers receive the Postal Employee's Guide to Safety: Handbook EL-814 (hereinafter "Handbook"), which states in relevant part: "When you are traveling to and from your route, when you are moving between park and relay points, and when you are entering or crossing intersecting roadways, you must be sure that all vehicle doors are closed." (Handbook, Ex. I to Def.'s SOF [34-9] at 42.) The Handbook goes on to say: "When you are operating a vehicle on delivery routes and traveling in intervals of 500 feet (1/10 mile) or less at speeds no greater than 15 miles per hour between delivery stops, you may leave the door on the driver's side open. You must still close the door when traveling through intersections." (*Id.* at 43.) Plaintiff concedes that she received the Handbook and was familiar with it. (Def.'s SOF ¶ 12; Rogers Dep. 38:14–19.)

On September 16, 2016, Martin and Puri issued a notice of removal letter to Plaintiff. (Def.'s SOF ¶ 16.) Had this episode been Plaintiff's first infraction, she would have received only a letter of warning. (*Id.* ¶ 17.) But prior to the August 2016 incident, Plaintiff had been disciplined for various infractions, including: (1) a letter of warning for misdelivering mail in August 2012, (2) a seven-day suspension for "throwing mail away"[3] in March 2013, and (3) a "long term suspension"

---

[3]        More specifically, Plaintiff was disciplined for placing two pieces of deliverable mail in the receptacle for undeliverable bulk business mail ("UBBM"). (Rogers's Disciplinary Records, Ex. D to Def.'s SOF [34-4], at 3.) UBBM is third-class mail that cannot be delivered, typically because the recipient relocated, and items placed in the UBBM bin are ultimately recycled. (Management Instruction: Recycling of Discarded Mail and UBBM, Ex. 3 to Pl.'s Mem. at 16–18.) Plaintiff nonetheless placed two pieces of mail that could have been delivered into the bin (one piece of mail was marked "Change Service Requested," and the other was second-class mail for a current resident). (Rogers's Disciplinary Records at 3.) In her memorandum opposing summary judgment, Plaintiff argues that clerks "go through [the UBBM] before the end of the day," implying that someone would have caught her mistake and there was no harm done. (Pl.'s Mem. at 2:7–8.) But she does not dispute that she received a seven-day suspension for a second infraction. Indeed, although unremarked by the parties, it appears that Plaintiff put deliverable mail into the

for taking an unapproved break in December 2015. (*Id.* ¶ 19.) USPS follows a progressive discipline scheme, in which employees are disciplined in four stages: (1) a letter of warning, (2) a paid seven-day suspension, (3) a paid fourteen-day suspension, and (4) termination. (*Id.*) Accordingly, the August 2016 incident was her fourth infraction.[4]

Plaintiff filed a union grievance in which she asserted that her termination violated the collective bargaining agreement governing her employment because the policy against driving with a door open was unclear to Plaintiff. (*Id.* ¶ 21.) An arbitration hearing was held on January 5, 2017, and the union and management presented testimony and exhibits. (*Id.* ¶ 22.) The arbitrator ruled in favor of USPS, finding that there was a longstanding rule prohibiting drivers from leaving their doors open when moving more than 500 feet, that Rogers had traveled 650 feet with her door open, and that her termination was warranted in light of her prior infractions. (*Id.* ¶ 22; *see also* Arbitration Decision, Ex. F to Def.'s SOF [34-6] at 11.) Plaintiff's termination went into effect on January 7, 2017. (Def.'s SOF ¶ 24.) Meanwhile, Plaintiff had filed a charge with the Equal Employment Opportunity Commission ("EEOC") on September 20, 2016, four days after receiving her notice of removal, alleging that in terminating her, USPS discriminated against her based on

UBBM bin on several other occasions in May and November 2012, before the seven-day suspension in March 2013. (*See* Rogers's Disciplinary Records at 4.)

[4] Plaintiff's unapproved break in December 2015 was originally noticed as a removal, but Plaintiff filed a grievance, and her discipline was converted to a "long term suspension," presumably with the assistance of her union. (Def.'s SOF ¶ 19; *see also* Pre-Arbitration Agreement of 2/9/16, Ex. 4 to Def.'s SOF [34-4] at 10.) The disparity between the discipline Plaintiff initially received (termination) and the standard discipline for a third infraction (a fourteen-day suspension) may be explained by an additional fourteen-day suspension in June 2014 for delivering mail on-foot in an unsafe manner (specifically, failing to wear ice-gripping footwear while walking through a customer's frozen landscaping). (Def.'s SOF ¶ 20.) That suspension was expunged after Rogers complained that the suspension was a product of discrimination on the basis of her disability. (*Id.*; *see also* EEOC Notice of 6/13/16, Ex. 4 to Pl.'s Mem. at 24.) Martin declared under oath that the 2014 suspension was removed from Plaintiff's personnel file for purposes of progressive discipline, and it did not contribute to her ultimate termination. (Martin Decl. ¶ 15.)

her race and sex. (Def.'s SOF ¶ 23.) The EEOC concluded that Plaintiff had not shown discrimination but notified her of her right to sue. (*See* Notice of Final Action 5/9/19, Ex. A to Compl. [1] at 1–2.).

Plaintiff filed this suit *pro se* on August 9, 2019, bringing various Title VII claims against her employer. In support of her race and sex discrimination claims, Plaintiff stated at her deposition that "white and Hispanic people" were allowed to take breaks when she was not. (Rogers Dep. 24:20–25:6). Plaintiff further alleges that her termination was in retaliation for engaging in equal employment opportunity activity. (Compl. ¶¶ 12–13.) Plaintiff filed five EEO charges between September 2014 and December 2015. (*See* Def.'s SOF ¶ 25 (citing Rogers Dep. 19–31).) The substance and disposition of these charges are unclear because the EEOC's final decisions are not in the record, but Plaintiff discussed three of the five charges briefly at her deposition. The September 2014 and October 2014 charges alleged disability discrimination by Puri and Martin when Rogers returned to work after an on-the-job injury. (*See* Rogers Dep. 19:14–22:9.) The December 2015 charge concerned Rogers's termination for taking an unapproved break, which was later converted to a long-term suspension.[5] (*See id.* 22:21–23: 18, 30:5–16.) The court cannot determine the basis for the two remaining charges, which were filed in August and September of 2015. (*See* Def.'s SOF ¶ 25.)

To support her discrimination and retaliation claims, Plaintiff argues that three of her coworkers were disciplined less harshly for similar misconduct. (*Id.* ¶ 29.) Specifically, she claims that S.S., R.B., and R.M. were all caught with their doors open, but were not terminated. (*Id.* (citing Rogers Dep. 60).) The record does not reveal the race or sex of these comparators, but Plaintiff believes they did not have any prior EEO history. (Rogers Dep. 60:24–61:7.) Defendant contends that these employees were not similarly situated to Plaintiff: they had not been

---

[5]     *See supra* note **Error! Bookmark not defined.** (explaining why this infraction was reduced from a termination to a long-term suspension.)

previously disciplined, and each had left the vehicle door open while parked, not while in motion. (Def.'s SOF ¶¶ 30–31 (citing Martin Decl., Ex. A to Def.'s SOF [34-1] ¶¶ 18–19; Comparator Disciplinary Records, Ex. H to Def.'s SOF [34-8]).) Defendant emphasizes that leaving a vehicle door open while parked renders mail vulnerable to theft, but it does not put a driver's personal safety at risk. (Def.'s SOF ¶ 31.)

## LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts should draw all inferences in favor of the nonmoving party, but "[i]nferences supported only by speculation or conjecture will not suffice." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must "respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Johnson*, 892 F.3d at 894. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Although courts liberally construe the pleadings of *pro se* plaintiffs, summary judgment may still be granted when a rational jury could not find for the plaintiff based on the evidence presented. *See, e.g.*, *Greer v. Bd. of Educ. of Chi.*, 267 F.3d 723, 727 (7th Cir. 2001) (affirming grant of defendant's motion for summary judgment where *pro se* plaintiff did not present sufficient evidence of discrimination or retaliation).

6

## DISCUSSION

Plaintiff did not comply with Local Rule 56.1(b), despite receiving a notice from Defendant warning her of the consequences of failing to do so. (*See* Notice to Pro Se Litigant [35]). That rule requires a party opposing summary judgment to respond to each paragraph of the moving party's statement of material facts with specificity, and to submit a statement of additional material facts in numbered paragraphs. *See* L.R. 56.1(b)(2)–(3), (e). Plaintiff did not submit a response to Defendant's statement of facts, nor did she file a statement of additional facts; her opposition to summary judgment consists of a two-page memorandum and several exhibits. Accordingly, facts asserted in Defendant's statement of facts "may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3); *see also* FED. R. CIV. P. 56(e).

A district court has discretion to enforce local rules strictly, *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 956–57 (7th Cir. 2021) (collecting cases)—even for *pro se* litigants. *See Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). This court nonetheless construes Plaintiff's submissions liberally as an attempt at compliance with the local rules and views the evidence in the light most favorable to her as the nonmoving party. Even so, the court concludes that there are no factual disputes precluding summary judgment in favor of Defendant on her Title VII discrimination and retaliation claims. The court also finds no support for Plaintiff's claims that Defendant "failed to stop harassment" or that Defendant subjected her to a hostile work environment. Thus, as explained below, Defendant's motion for summary judgment is granted.

## I. Race and Sex Discrimination

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any employee because of the employee's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). To succeed on a Title VII discrimination claim, a plaintiff must prove that "[1] he is a member of a class protected by the statute, [2] that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work

7

environment), and [3] that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018). More generally, courts ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Because Plaintiff has not specified which framework she is invoking to prove her discrimination claims, the court assesses the evidence under the familiar burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as well as the flexible approach explained in *Ortiz*. *See, e.g.*, *Igasaki*, 988 F.3d at 957–59 (analyzing plaintiff's discrimination claims under both *McDonnell Douglas* and *Ortiz*).

### A. Analysis under the *McDonnell Douglas* Approach

To establish a *prima facie* case of discrimination under the *McDonnell Douglas* burden-shifting approach, Plaintiff must show that: (1) she belongs to a protected class; (2) she met Defendant's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. *See Gamble v. Fiat Chrysler Autos. U.S. L.L.C.*, 993 F.3d 534, 537 (7th Cir. 2021) (citing *Igasaki*, 988 F.3d at 957). Once the plaintiff has satisfied each element of a *prima facie* case, "the burden shifts to the employer to offer a nondiscriminatory motive, and if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Gamble*, 993 F.3d at 937 (quoting *Igasaki*, 988 F.3d at 957). But "[i]f a plaintiff is unable to establish a *prima facie* case of employment discrimination under *McDonnell Douglas*, an employer may not be subjected to a pretext inquiry." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 327 (7th Cir. 2002).

Defendant does not dispute that Plaintiff belongs to a protected class based on her race (African American) and sex (female), or that she suffered an adverse employment action when

she was terminated. Rather, Defendant contends that Plaintiff has not established (1) that she met legitimate employment expectations, or (2) that similarly situated employees received better treatment. (Def.'s Mem. [33] at 7–8.) The court agrees that Plaintiff cannot make out a *prima facie* case, so there is no need to proceed to the second and third steps of the burden-shifting framework. *See Peele*, 288 F.3d at 327.

### 1. Legitimate Employment Expectations

Plaintiff was fired after Postmaster Puri saw her driving her postal vehicle with her door open for more than 500 feet. (Def.'s SOF ¶¶ 13–15.) Defendant argues that this means she was not meeting legitimate employment expectations, an issue on which she bears the burden of proof. *See Peele*, 288 F.3d at 328. The arbitrator in Plaintiff's union grievance action found that Defendant had an established policy prohibiting employees from driving with their doors open when moving more than 500 feet. (Def.'s SOF ¶¶ 22, 27.) The arbitrator also found that the distance Plaintiff covered while her door was open was 650 feet. (Arbitration Decision at 3.)[6] Plaintiff asserts in her memorandum that she "definitely had on [her] seatbelt and shoulder strap like always."[7] (Pl.'s Mem. at 2:15–16.) But again, she does not dispute that her door was open. (*See* Def.'s Memo at 3-4.) Instead, she claims confusion about the safety rules concerning open doors while driving.

---

[6] "An arbitration decision in favor of the employer, while not dispositive, may be given such weight in a Title VII proceeding as the court deems appropriate under the particular facts and circumstances of the case." *Quintero v. Frank*, No. 91 C 7477, 1994 WL 262241, at *6 n.2 (N.D. Ill. June 13, 1994) (citing *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 59–60 & n.21 (1974)); *see, e.g., Fogle v. Ispat Inland, Inc.*, 32 F. App'x 155, 157 (7th Cir. 2002) (noting that arbitrator's finding supported conclusion that employee was not meeting legitimate employment expectations).

[7] There are apparently two components of a "seatbelt" in a postal vehicle. The Handbook states that lap belts are required at all times, but the shoulder strap may be unfastened if necessary to reach curbside mailboxes. (Handbook at 42.)

Those rules may not be a model of clarity. Defendant points to language in the Handbook that "when you are traveling to and from your route, when you are moving between park and relay points, and when you are entering or crossing intersecting roadways, you must be sure that all vehicle doors are closed." (Handbook at 42.) The Handbook contemplates an exception to the closed-door requirement when drivers are "on delivery routes and traveling in intervals of 500 feet (1/10 mile) or less at speeds no greater than 15 miles per hour between delivery stops . . . ." (*Id.* at 43.) Defendant asserts that "mail carriers were expected to drive with their doors closed at all times through industrial/commercial areas." (Def.'s SOF ¶ 28.) But the Handbook itself does not limit the 500-feet exception to residential streets, and according to Plaintiff, Martin was inconsistent in explaining when doors could be open while driving. (Rogers Dep. 40:16–42:9.) Plaintiff's own route contained both residential and industrial areas. (*Id.* 14:3–16.) And although Martin claims that he discussed the vehicle door policy on at least eight occasions during his "Safety & Service Talks" (Martin Decl. ¶¶ 5–7), Plaintiff testified that she was confused about the rule: "[I]t's in the safety handbook about driving with your door open . . . which is it? We can or we can't?" (Rogers Dep. 41:24–42:1.) Plaintiff's understanding of the policy was that carriers could leave their doors open so long as they wore seatbelts. (*Id.* 38:22–24.)

The court assumes for purposes of this opinion that Plaintiff was genuinely confused about circumstances in which open-door driving was permitted. Ultimately, however, Plaintiff's claim that she was meeting USPS's legitimate expectations must be based on more than her own confusion about the policy. So long as the work safety rules were communicated in the same way to all workers, Defendant was entitled to enforce those rules regardless of whether Plaintiff was confused about them. The court need not address the question further because, as explained

10

below, Plaintiff has identified no basis for concluding that enforcement of the policy was based on her race or sex.[8]

### 2. Treatment of Similarly Situated Employees

To survive summary judgment under *McDonnell Douglas*, Plaintiff must also present evidence that similarly situated employees outside of her protected class were treated more favorably. The relevant inquiry is "whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis." *de Lima Silva v. Wis. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019) (internal quotation marks and citation omitted). Often, the comparability of other employees is left to the jury, but "when the facts of a case suggest that no reasonable jury could see enough commonality for a meaningful comparison between the employees, summary judgment is appropriate." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 927 (7th Cir. 2019) (citing *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012)). The conduct at issue between comparators need not be identical; rather, "the critical question is whether [the employees] have engaged in conduct of comparable seriousness." *de Lima Silva*, 917 F.3d at 559 (quoting *Peirick v. Ind. Univ.–Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007)).

---

[8]     For similar reasons, the court is not moved by Plaintiff's assertion that prior discipline should have been "out" of her "file" (presumably her personnel file) after two years had passed. (Pl.'s Mem. 2:8–9; *see also* Rogers Dep. 57:14–23.) She does not identify the basis for this assertion, and Defendant does not address it, but the current Collective Bargaining Agreement provides that two-year-old disciplinary records may be removed from an employee's personnel file "upon the employee's written request . . . if there has been no disciplinary action initiated against the employee in that two-year period." *Collective Bargaining Agreement between American Postal Workers Union, AFL-CIO and U.S. Postal Service*, Art. 16, Sec. 10, 100–01 (Sept. 21, 2018–Sept. 20, 2021), https://apwu.org/sites/default/files/2018-2021-apwu-usps-cba-online.pdf (last visited Sept. 22, 2021). Assuming that the same provision applied in 2016, neither of these conditions were met: Plaintiff was disciplined each year following the August 2012 letter of warning (Def.'s SOF ¶¶ 19–20), and there is no evidence that Plaintiff requested that these records be removed. Nor is there any evidence that persons of a different race or sex in similar circumstances had prior disciplinary records expunged.

In the context of her retaliation claim (discussed below), Plaintiff identified three co-workers who received less severe discipline than she did. (Def.'s SOF ¶ 29; Rogers Dep. 59:16–60:16.) All three of those co-workers received letters of warning after leaving their vehicle doors open. Plaintiff believes that none of them had a prior history of EEO complaints (Rogers Dep. 60:24–61:7), but there is nothing in the record indicating their race or sex. Assuming that Plaintiff would identify the same workers with respect to her race and sex discrimination claims, they do not appear to be similarly situated. Defendant asserts that all three were disciplined for leaving doors open while parked, whereas Plaintiff was disciplined for leaving the door open while driving. The comparators' conduct left mail in their vehicles vulnerable to theft, whereas Plaintiff's conduct put her personal safety at risk. (Def.'s SOF ¶ 30.) Tellingly, the letters of warning for the three comparators list "Failure to Follow Postal Security Rules" as the charge, while Plaintiff's Notice of Removal lists "Failure to Perform Your Duties in Safe Manner" as the charge. (*Compare* Comparator Disciplinary Records at 3, 8, 12, *with* Notice of Removal at 1.) Moreover, none of the three comparators had been previously disciplined, meaning that a letter of warning was the appropriate sanction under USPS's progressive discipline scheme. (Def.'s SOF ¶ 31.) Plaintiff herself received a letter of warning for her first infraction—misdelivering mail. (*See* Rogers Letter of Warning, 8/28/12, Ex. 4 to Def.'s SOF [34-4] at 1.) Because "no reasonable jury could see enough commonality for a meaningful comparison between the employees," *Rozumalski*, 937 F.3d at 927, the court agrees with Defendant that summary judgment is appropriate on Plaintiff's race and sex discrimination claims.

The facts here are similar to those in *Gamble v. Fiat Chrysler Autos. U.S. L.L.C.,* 993 F.3d 534 (7th Cir. 2021). There, the plaintiff was terminated after a second infraction of the employer's anti-harassment policy. *Id.* at 536. The Seventh Circuit affirmed summary judgment against the plaintiff on his race discrimination claim, noting that plaintiff's alleged comparator had violated the policy just once. *Id.* at 539. Here, too, Plaintiff had a history of previous discipline while her

comparators did not, and she herself received the same discipline as those comparators after her first infraction. The three comparators are therefore not similarly situated to Plaintiff. When pressed at her deposition about the bases for her claims of race and sex discrimination, Plaintiff replied, "I think it was all of that, because the other people that had been injured on the job, they were white and Hispanic people, and they were . . . allowed to take their break just like everybody else . . . . But as soon as I take my break, [Postmaster Puri] wrote me up." (Rogers Dep. 24:25–25:6.) Plaintiff seems to be describing the December 2015 incident when she was disciplined for taking an unapproved break. That incident is not the subject of this lawsuit, but regardless, she has not presented evidence that these unnamed "white and Hispanic" individuals were otherwise similarly situated.

Because Plaintiff has not shown that she was meeting legitimate employment expectations or that similarly situated employees were treated more favorably, she has not established a *prima facie* case of discrimination under *McDonnell Douglas*. The court therefore need not consider whether Defendant's reason for terminating her was pretextual. *See Peele*, 288 F.3d at 327.

## B. Analysis under *Ortiz*

Plaintiff fares no better when viewing the evidence as a whole. Under *Ortiz,* the court simply asks "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Plaintiff has not come forward with evidence that she was treated unfairly on the basis of race or sex. The December 2015 incident, when "white and Hispanic people" were allegedly allowed to take a break but she was not, might reflect disparate treatment. But even if that incident were relevant to this lawsuit, there is no evidence that race or sex discrimination was the reason that other employees were allowed to take breaks. In *Igasaki,* the court concluded that a plaintiff's recitation of past wrongs, including

13

"general harsh treatment" that other employees did not receive, was not enough to prove that the plaintiff was ultimately terminated because of his race or sex. 988 F.3d at 959. Likewise, Plaintiff here has not presented any evidence that she was terminated because of her race or sex.

## II.    Retaliation

Title VII prohibits employers from retaliating against employees who have "made a charge, testified, assisted, or participated in any manner in [an Equal Employment Opportunity] investigation, proceeding, or hearing . . . ." 42 U.S.C. § 2000e-3(a). To survive summary judgment on a retaliation claim, an employee must produce enough evidence for a reasonable jury to conclude that "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two." *Rozumalski*, 937 F.3d at 924. Causation can be established by circumstantial evidence, including "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Id*. (quoting *King v. Ford Motor Co.*, 872 F.3d 833, 841 (7th Cir. 2017). "For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, [courts] typically allow no more than a few days to elapse between the protected activity and the adverse action." *Igasaki*, 988 F.3d at 959 (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)).

By the time that Plaintiff was seen driving with her door open in August 2016, about eight months had passed since Plaintiff's last EEO charge, which was filed in December 2015. (Def.'s SOF ¶ 25.) Plaintiff was terminated the following month, meaning that almost nine months had elapsed between her protected activity and the adverse action. Nine months is far more than a few days, so Plaintiff cannot establish causation based on timing alone. *See Igasaki*, 988 F.3d at 959–60 (concluding that a two-month gap between plaintiff's EEO complaint and termination was insufficient to infer causation). The fact that Plaintiff's was terminated after an infraction post-dating her EEO activity further undermines any "suspicious timing" argument. *See Kidwell*, 679

14

F.3d at 967–69 (concluding that "intervening circumstances," including the employee's own workplace policy violations, defeated inference of causation).

Plaintiff has not identified any evidence, other than her personal belief, showing that the EEO charges were the reason for her termination. Rogers stated at her deposition that her termination "was retaliation from . . . the EEOs, because each time [Postmaster Puri] wrote me up, I would go to the EEO." (Rogers Dep. 58:10–12.) When asked whether she had evidence supporting that claim, Plaintiff again pointed to the incident when she was disciplined for taking an unapproved break. (Rogers Dep. 59:16–24.) Viewed generously, Plaintiff's testimony suggests a pattern of employee discipline, followed by protected activity, and then more discipline. But inferring retaliation from such a pattern alone would amount to "impermissible speculation" by the court; Plaintiff must provide more evidence. *See Igasaki*, 988 F.3d at 960 (declining to infer causation based on a "years-long" pattern of poor performance reviews).

Plaintiff argues that the three employees identified above—S.S., R.B., and R.M.—are relevant comparators for her retaliation claim. Plaintiff believes that these co-workers had no previous EEO activity, but observes that they "still have their job[s]." (Rogers Dep. 60:6–61:2.) As an initial matter, Plaintiff's own belief about her coworkers' previous EEO activity is insufficient to create a factual dispute. But even if she had evidence that they had not engaged in protective activity, any argument based on these comparators would fail for the same reason that her race and sex discrimination claims fail: the fact that these employees received less severe discipline is relevant only if they were similarly situated to Plaintiff. *See, e.g., Donley v. Stryker Sales Corp.*, 906 F.3d 635, 639 (7th Cir. 2018) (concluding that plaintiff and fellow employee were not similarly situated, but reversing district court's grant of summary judgment on other grounds). Again, Plaintiff has not shown that the alleged comparators were similarly situated: they committed materially different infractions, and they lacked any prior history of discipline.

The court grants summary judgment in favor of Defendant on Plaintiff's retaliation claim.

15

### III.     Additional Claims

Finally, Plaintiff claims that Defendant "failed to stop harassment" and subjected her to a hostile work environment "while aggressively attempting to terminate [her] employment after filing two previous EEOC Complaint's [sic] against the same two Wood Dale Postal Management Officials, Supervisor William Martin and Postmaster Kusum Puri."   (Compl. ¶ 12.)   Plaintiff contends that her termination and previous discipline created the allegedly hostile work environment.   (Rogers Dep. 65:8–11.)   Defendant does not address either of these claims in its motion for summary judgment.   For her part, Plaintiff does not mention these additional claims in her opposition brief, and it is unclear how they differ from her discrimination and retaliation claims.

A work environment is considered hostile for purposes of Title VII when it is "permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'"   *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, F.S.B. v. Vinson*, 477 U.S. 57, 65–67 (1986)).   In order to prove a hostile work environment claim, the plaintiff must show that "(1) [she] was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 636 (7th Cir. 2019).

As discussed above, Plaintiff has not shown that her termination was motivated by her membership in protected classes.   When asked at her deposition if there was "anything else that created a hostile work environment for you that we haven't talked about," Plaintiff responded: "No. It's strictly this," referring to her termination.   (Rogers Dep. 65:8–11.)   Plaintiff presents no evidence that she was subjected to discriminatory intimidation, ridicule, or insult, such as racial epithets.   *See, e.g.*, *Gates*, 916 F.3d at 637–39 (reversing district court's grant of summary judgment where plaintiff's supervisor repeatedly used racially offensive language).   The court

16

therefore finds no support in the record for Plaintiff's claim that Defendant failed to stop harassment or subjected her to a hostile work environment. *See Acequia, Inc. v. Prudential Ins. Co. of Am.*, 226 F.3d 798, 807–08 (7th Cir. 2000) (affirming summary judgment, even though the movant did not specifically address all of the nonmovant's claims, because the nonmovant was on notice that summary judgment was under consideration by the court). Accordingly, these additional claims are dismissed as well.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant's motion for summary judgment [32] is granted.

ENTER:

Dated: September 23, 2021

_____
REBECCA R. PALLMEYER
United States District Judge